Robert J. Nelson (State Bar No. 132797)
*rnelson@lchb.com*
Kristen Law Sagafi (State Bar No. 222249)
*klaw@lchb.com*
Jordan Elias (State Bar No. 228731)
*jelias@lchb.com*
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Attorneys for Plaintiffs

[Additional counsel in signature block]

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED DESERT CHARITIES, FRED EDE, III, EMILY WILLIAMS, BRUCE PRITCHARD, and JEAN STEINER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SLOAN VALVE COMPANY, AMERICAN STANDARD BRANDS AS AMERICA, INC., KOHLER CO., GERBER PLUMBING FIXTURES, LLC, MANSFIELD PLUMBING PRODUCTS, LLC, and HOME DEPOT, U.S.A., INC.,<br><br>Defendants. | Case No. CV12-06878 SJO (SHx)<br><br>**PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Action Filed: August 9, 2012<br><br>*The Honorable S. James Otero*<br><br>Date:      March 3, 2014<br>Time:      10:00 a.m.<br>Dept.:     Courtroom 1<br><br>Consolidated Cases:<br>*Berube v. Flushmate*<br>2:13-cv-02372-SJO-SH<br>*Brettler v. Flushmate*<br>2:13-cv-02499-SJO-SH<br>*Kubat, et. al. v. Flushmate*<br>2:13-cv-02425-SJO-SH<br>*Patel v. Flushmate*<br>2:13-cv-02428-SJO-SH<br><br>Related Case:<br>*Dimov, et. al. v. Sloan Valve Co.*<br>1:12-cv-09700 (N.D. Ill) |

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**:

PLEASE TAKE NOTICE that on March 3, 2014, at 10:00 a.m., in the Courtroom of the Honorable S. James Otero, United States District Judge for the Central District of California, located at 312 North Spring Street, Los Angeles, CA 90012, Plaintiffs, on behalf of themselves and all others similarly situated, will and hereby do move the Court, pursuant to Federal Rule of Civil Procedure 23(e), for entry of an Order preliminarily approving a proposed Settlement Agreement ("Settlement") entered into between the parties, and for other related relief.

By this unopposed motion, Plaintiffs respectfully move the Court for an Order:

1.      Preliminarily approving the Settlement in this action pursuant to Federal Rule of Civil Procedure 23(e);[1]

2.      Preliminarily certifying a Settlement Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) for settlement purposes only;

3.      Appointing Class Counsel;

4.      Appointing Settlement Class Representatives;

5.      Approving the parties' proposed forms of notice and notice program, and directing that notice be disseminated pursuant to this program; and

6.      Setting a Fairness Hearing and certain other dates in connection with the final approval of the Settlement.

This Motion is based on the accompanying Memorandum of Points and Authorities, the Settlement Agreement, the Declarations of Kristen Law Sagafi, Katherine Kinsella, and Arnold Rodio, the documents attached thereto, any reply papers, the argument of counsel, and all papers and records on file in this matter.

---

[1] A copy of the executed Settlement Agreement ("Settlement") is attached as Exhibit 1 to the accompanying Declaration of Kristen Law Sagafi; attached thereto as Exhibit 2 is the Plan of Allocation.

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION....................................................................i

MEMORANDUM OF POINTS AND AUTHORITIES......................................... 1

I.      INTRODUCTION ......................................................................................... 1

II.     LITIGATION HISTORY ............................................................................. 3

    A.      Procedural History of This Action. ................................................ 3

    B.      Related Actions. ............................................................................. 4

    C.      Plaintiffs' Factual Allegations and Claims. .................................. 5

    D.      Settlement Negotiations, Related Proceedings in This Court, and
        Confirmatory Discovery. ................................................................ 7

III.    SUMMARY OF THE SETTLEMENT TERMS ......................................... 9

    A.      Settlement Class. ............................................................................ 9

    B.      Settlement Consideration. ............................................................ 10

        1.      Reimbursement for Installation Costs. ............................. 10

        2.      Full Reimbursement for Repairs Related to Property
             Damage. ............................................................................ 11

    C.      Settlement Funding Schedule. ..................................................... 12

    D.      Claims Process. ............................................................................ 13

    E.      Proposed Class Notice. ................................................................ 14

    F.      Attorneys' Fees and Costs; Incentive Awards. ........................... 16

    G.      Settlement Release. ...................................................................... 16

IV.    THIS SETTLEMENT SATISFIES THE LEGAL STANDARDS FOR
    OBTAINING PRELIMINARY APPROVAL ........................................... 17

    A.      Summary of Argument. ................................................................ 17

    B.      Preliminary Approval Is Appropriate. ........................................ 18

        1.      The Settlement Is the Product of Arms' Length
             Negotiations and Is Informed by the Litigation and by
             Factual Investigations. ..................................................... 19

        2.      This Settlement Is Within the Range of Reasonableness
             Given the Benefits Conferred and the Risks of Litigation. ...... 21

        3.      Plaintiffs' Counsel, Highly Experienced Class Action
             Attorneys, Support the Settlement. .................................. 23

V.      THE SETTLEMENT CLASS SHOULD BE CERTIFIED AND
    CLASS COUNSEL APPOINTED ........................................................... 24

VI.    THE PROPOSED CLASS NOTICE SHOULD BE APPROVED .............. 28

VII.   PLAINTIFFS' COUNSEL WILL APPLY SEPARATELY FOR
    ATTORNEYS' FEES AND COSTS AND INCENTIVE AWARDS......... 30

VIII.  THE FINAL APPROVAL HEARING SHOULD BE SCHEDULED......... 31

IX.    CONCLUSION ........................................................................................... 32

# TABLE OF AUTHORITIES

**Page**

## CASES

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997) ..................................................................24, 25, 27, 28

*Behrens v. Wometco Enters., Inc.*,
  118 F.R.D. 534 (S.D. Fla. 1988) ........................................................... 22

*Boyd v. Bechtel Corp.*,
  485 F. Supp. 610 (N.D. Cal. 1979)......................................................... 24

*Churchill Village, L.L.C. v. Gen. Elec.*,
  361 F.3d 566 (9th Cir. 2004) ................................................................ 18

*Class Plaintiffs v. City of Seattle*,
  955 F.2d 1268 (9th Cir. 1992) .............................................................. 18

*Cortez v. Purolator Air Filtration Prods. Co.*,
  999 P.2d 706 (Cal. 2000) ..................................................................... 26

*Create-A-Card, Inc. v. Intuit, Inc.*,
  2009 U.S. Dist. LEXIS 93989 (N.D. Cal. Sept. 22, 2009)...................... 20

*Ellis v. Naval Air Rework Facility*,
  87 F.R.D. 15 (N.D. Cal. 1980) ............................................................. 24

*Enterprise Energy Corp. v. Columbia Gas Transmission Corp.*,
  137 F.R.D. 240 (S.D. Ohio 1991) ........................................................ 23

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ......................................................... 18, 24

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
  MDL No. 2147, 2011 WL 2204584 (N.D. Ill. June 2, 2011) .......................... 21

*In re Heritage Bond Litig.*,
  2005 U.S. Dist. LEXIS 13555 (C.D. Cal. June 10, 2005)................................. 19

*In re Linerboard Antitrust Litig.*,
  296 F. Supp. 2d 568 (E.D. Pa. 2003)..................................................... 22

*In re Pharm. Indus. Average Wholesale Price Litig.*,
  252 F.R.D. 83 (D. Mass. 2008) ............................................................ 22

*In re Tableware Antitrust Litig.*,
  484 F.Supp.2d 1078 (N.D. Cal. 2007)............................................... 19, 28

*In re Vioxx Class Cases*,
  180 Cal.App.4th 116 (Cal. Ct. App. 2009)............................................. 26

*Mazza v. American Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ............................................................... 22

**TABLE OF AUTHORITIES**
**(continued)**

Page

*McLaughlin v. American Tobacco Co.,*
  522 F.3d 215 (2d Cir. 2008) ................................................................. 22

*Mirkin v. Wasserman,*
  858 P.2d 568 (Cal. 1993) ..................................................................... 22

*Montanez v. Gerber Childrenswear, LLC,*
  2011 U.S. Dist. LEXIS 150942, 2011 WL 6757875
  (C.D. Cal. 2011) .................................................................................. 26

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,*
  221 F.R.D. 523 (C.D. Cal. 2004) ......................................................... 24

*Officers for Justice v. Civil Serv. Comm'n,*
  688 F.2d 615 (9th Cir. 1982) ............................................................... 18

*Rodriguez v. West Publ'g Corp.,*
  563 F.3d 948 (9th Cir. 2009) ............................................................... 31

*Sullivan v. DB Invs., Inc.,*
  667 F.3d 273 (3d Cir. 2011) ................................................................ 27

*Vizcaino v. Microsoft Corp.,*
  290 F.3d 1043 (9th Cir. 2002) ............................................................. 30

*Wal-Mart Stores, Inc. v. Dukes,*
  131 S. Ct. 2541 (2011) ........................................................................ 24

*Young v. Polo Retail, LLC,*
  2006 WL 3050861 (N.D. Cal. Oct. 25, 2006) ..................................... 19

**STATUTES**

Cal. Comm. Code § 2714 ........................................................................ 26

**RULES**

Fed. R. Civ. P. 23 ................................................................................... 17

Fed. R. Civ. P. 23(a) .............................................................................. 24

Fed. R. Civ. P. 23(b)(3) ................................................................... 24, 26

Fed. R. Civ. P. 23(c)(2)(B) ..................................................................... 28

Fed. R. Civ. P. 23(e) .............................................................................. 19

Fed. R. Civ. P. 23(e)(1) .......................................................................... 28

Fed. R. Civ. P. 23(f) ............................................................................... 23

Fed. R. Civ. P. 23(g) .............................................................................. 27

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

**TREATISES**

*Manual for Complex Litigation (Third)* § 30.42 (1995)....................................20, 28

*Manual for Complex Litigation* § 21.63, *et seq.* (4th ed. 2004) .............................17

*Newberg on Class Actions* (4th ed. 2002)

§ 8:32 ...............................................................................................................28
§ 11:22, *et seq.*.................................................................................................17
§ 11:25 .............................................................................................................19
§ 11:41 .............................................................................................................19
§ 11:53 .............................................................................................................28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiffs United Desert Charities, Fred Ede, III, Emily Williams, Bruce Pritchard, Jean Steiner, Daniel Berube, Jeffrey Brettler, Randy Kubat, John Snyder, Milen Dimov, Trigona Dimova, Scott Iver, Neal Olderman, and Pankaj Patel ("Plaintiffs"), individually and as representatives of the proposed Settlement Class, submit this Memorandum in support of their motion for preliminary approval of the proposed settlement agreement ("Settlement") with Defendants Sloan Valve Company ("Sloan"), AS America, Inc., doing business as American Standard Brands ("American Standard"), Kohler Co. ("Kohler"), Gerber Plumbing Fixtures, LLC("Gerber"), Mansfield Plumbing Products, LLC ("Mansfield"), and Home Depot, U.S.A., Inc. ("Home Depot") (collectively, "Defendants").

The proposed Settlement resolves five related federal cases arising from the possibility that Flushmate Systems manufactured by Sloan may unexpectedly leak and/or burst. The first of these related cases was filed August 9, 2012. After vigorously contested litigation and motion practice in multiple federal venues and months of intense negotiation, Plaintiffs now submit a comprehensive proposed Settlement for this Court's review and approval.

The proposed Settlement provides substantial cash relief to consumers who own or owned toilets equipped with the Flushmate System, which may leak and/or burst. A burst may result in shattering of the porcelain fixture, with a risk of other property damage and personal injury. The cash payments available under the Settlement will fairly and substantially reimburse Settlement Class members for expenses related to the repair or replacement of their Flushmate Toilets. This Settlement enhances the relief available pursuant to Flushmate's ongoing Consumer Product Safety Commission Recall, which provides a free Repair Kit to consumers upon request, but does not include cash compensation for installation, repair, or

- 1 -

replacement costs. The proposed Settlement provides compensation for owners of Flushmate Toilets and promotes consumer safety.

Under the Settlement, Defendants will pay a minimum of $18,000,000 into a common fund to supply cash payments to owners of the Flushmate Toilets at issue in this case. The fund may increase if additional monies are required to satisfy property damage claims that exceed certain thresholds and the settlement fund has been exhausted. The claims period will last for at least two years to maximize the ability of Settlement Class members to participate in the Settlement. Moreover, the Agreement establishes a process for subsequent disbursement of unclaimed funds to eligible Class members at the close of the Claims Period if feasible.

This comprehensive Settlement is the result of four all-day mediation sessions before a retired judge, Hon. William Cahill, at JAMS, San Francisco. The hard-fought negotiations lasted nine months. The Settlement represents a significant achievement, both in terms of the completeness of relief offered and the public safety benefit from giving customers a monetary incentive to repair their Flushmate Toilets.

The Settlement is well within the range of reasonableness given the consideration offered to Class members and the risks of ongoing litigation, including legal hurdles attendant to certifying a class of consumers in multiple states. Preliminary approval of this valuable and carefully structured Settlement is appropriate and should be granted.

Therefore, Plaintiffs respectfully request that the Court enter an Order preliminarily approving the Settlement, certifying the Settlement Class, appointing Class Counsel and Settlement Class representatives, ordering notice disseminated to the Settlement Class, establishing deadlines for Settlement Class members to opt out or to object to the Settlement, and setting a Final Approval Hearing at which the Court will consider any objections and evaluate the proposed Settlement and a separate motion for attorneys' fees and costs and incentive awards.

## II.   LITIGATION HISTORY

### A.   Procedural History of This Action.

Plaintiffs filed their First Amended Class Action Complaint ("FAC") in this Court on October 5, 2012, naming Sloan, American Standard, Kohler, Gerber, Mansfield, and Home Depot as Defendants.[2] (ECF No. 20.) On October 22, 2012, those Defendants filed a transfer motion pursuant to 28 U.S.C. § 1404, which Plaintiffs opposed on November 5, 2012. (ECF Nos. 43, 48, 51, 54.) On December 12, 2012, the Court denied the transfer motion. (ECF No. 64.)

While that motion was pending, on November 5, 2012, Defendants moved to dismiss the FAC. (ECF Nos. 52, 53, 55, 60.) Plaintiffs filed a consolidated opposition on November 19, 2012, to which Defendants replied. (ECF Nos. 57, 61, 62.) On January 4, 2013, this Court denied in part and granted in part the motion to dismiss. The Court's detailed memorandum opinion guided the subsequent litigation and settlement negotiations. (ECF No. 65.)

Plaintiffs filed their Third Amended Complaint ("TAC") on February 7, 2013, and Defendants moved to dismiss it on March 4, 2013. (ECF Nos. 75, 76, 77.) Plaintiffs opposed the motions on March 18, 2013. (ECF Nos. 78, 79.) Upon stipulation of the parties, the Court on March 25, 2013, postponed the reply briefing and the hearing on the motions to dismiss to allow the parties to focus on mediation. (ECF No. 81.)

---

[2] Federal courts in the Eastern and Northern Districts of California dismissed related actions in favor of the first-filed *United Desert Charities* action. Plaintiff UDC filed its original complaint in this District on August 9, 2012, naming Sloan and American Standard as Defendants. (ECF No. 1.) Plaintiff Fred Ede, III filed his original complaint in the Eastern District of California on August 23, 2012, naming Sloan and Kohler as Defendants. (E.D. Cal. Case No. 1:12-cv-01391-LJO-DLB, ECF No. 1.) Plaintiff Emily Williams filed her original complaint in the Northern District of California on September 12, 2012, naming Sloan and Gerber as Defendants. (N.D. Cal. Case 3:12-cv-04757-EMC, ECF No. 1.)

### B.  Related Actions.

Plaintiffs in the above-captioned matter were the first to file product defect lawsuits arising from the Flushmate Systems. Thereafter, five other civil actions were filed around the country. The attorneys representing the plaintiffs in those actions participated in the mediation sessions with the Defendants, and the proposed Settlement efficiently resolves all the claims asserted in all the related actions:

- *Daniel E. Berube v. Flushmate, a Division of Sloan Valve Company*, Northern District of Florida, Case No. 3:12-CV-00531 (filed 11/2/12);

- *Jeffrey Brettler v. Flushmate, a Division of Sloan Valve Company*, District of New Jersey, Case No. 1:12-CV-07077 (filed 11/14/12);

- *Milen Dimov, et al. v. Sloan Valve Company*, Northern District of Illinois, Case No. 1:12-cv-09700 (filed 12/5/12);

- *Pankaj Patel v. Flushmate, a Division of Sloan Valve Company*, Northern District of California, Case No. 4:13-cv-00736 (filed 2/19/13); and

- *Randy Kubat, et al. v. Flushmate, a Division of Sloan Valve Company*, District Court of Colorado, Case No. 1:13-cv-00520 (filed 2/28/13).

Notwithstanding these far-flung cases, the parties and the courts laid the procedural groundwork for a global settlement based upon the common opportunity to resolve this national controversy in a manner that would benefit Plaintiffs, the putative Class, Defendants, and the public. Thus, on June 5, 2013, the federal district court presiding over *Dimov* stayed that action in deference to the parties' settlement negotiations. (N.D. Ill. Case No. 1:12-cv-09700, Dkt. No. 39.) Meanwhile, the plaintiffs in *Berube*, *Brettler*, *Patel*, and *Kubat* stipulated to transferring their actions to this Court for consolidation with the first-filed *UDC* case; those stipulations were entered. (*Berube*, N.D. Fla. Case No. 3:12-CV-00531, Dkt. No. 14; *Brettler*, D.N.J. Case No. 1:12-CV-07077, Dkt. No. 15; *Patel*, N.D.

Cal. Case No. 4:13-cv-00736, Dkt. No. 18; *Kubat*, D. Colo. Case No. 1:13-cv-00520, Dkt. No. 6).

Pursuant to the Settlement, Plaintiffs in the *UDC*, *Berube*, *Brettler*, *Patel*, and *Kubat* matters submit an amended and consolidated complaint concurrently with this motion—the Proposed Conditional Fourth Amended and Consolidated Complaint ("CFACC"). *See* Settlement, § I (Definition of "Complaint"). Also pursuant to the Settlement, the *Dimov* action will remain stayed while this Court considers Settlement approval. The *Dimov* action will be voluntarily dismissed with prejudice should the Settlement become effective and final. *See* Settlement, § II(I).

## C.   Plaintiffs' Factual Allegations and Claims.

Plaintiffs' complaint originally centered on the Series 503 Flushmate® III Pressure-Assist Flushing System (the "Flushmate System") manufactured by Sloan between October 14, 1997 and February 29, 2008.[3] (TAC ¶ 1, filed Feb. 7, 2013; ECF No. 75.) As alleged therein and in the new proposed consolidated complaint, the Flushmate System differs from traditional gravity flushing systems in that the water flushed is under constant pressure. The Flushmate System includes a pressurized tank made of two plastic halves welded together that is placed inside a traditional porcelain toilet fixture, and that forces water into the toilet bowl upon flushing. The compressed air inside this plastic tank sometimes exerts such pressure that the weld separates, causing leaks and bursts that can rupture the porcelain fixture, potentially resulting in other property damage as well as physical harm. (CFACC ¶¶ 32, 34.)

Plaintiffs allege that Flushmate Toilets incorporating this system were marketed as a premium product and sold at higher prices than gravity-based toilets.

---

[3] For Settlement purposes, the population of covered Flushmate Toilets has been expanded to those manufactured between October 14, 1997 and June 30, 2009. The Settlement Agreement and the Proposed Conditional Fourth Amended and Consolidated Complaint ("CFACC"), submitted concurrently herewith, reflect the expanded range of manufacture.

Distributors, contractors and plumbers ("Advisors") advised consumers to pay the premium based on their belief that the Flushmate System was more effective than traditional toilets and saved water. (CFACC ¶ 33.) These Advisors, however, would have recommended that consumers not purchase Flushmate Toilets had Sloan disclosed the safety hazard, and Plaintiffs and the members of the putative Class would not have purchased these toilets had they known that the Flushmate System had a propensity to burst and fail. (CFACC ¶¶ 78–79.)

According to the complaint, Sloan misrepresented in its written warranty—which it affixed to the inside of every toilet tank, posted on the Flushmate website, and included in the owner's manual, and which it knew toilet Advisors would see and rely upon—that the Flushmate System was "free of defects in material and workmanship." (CFACC ¶¶ 57–65.) Sloan promoted Flushmate as "more reliable" than other toilets as part of its stated strategy to "dispel myths about the undependability of low-consumption toilets." (CFACC ¶¶ 66–79 & Ex. I thereto.) Plaintiffs allege that Sloan failed to disclose the defect until June 2012, despite knowing of the defect when it issued product advisories in 2000 and 2003. (CFACC ¶¶ 39–41 & Exs. B & C thereto.)

The complaint alleges that as a result of the defect, Flushmate Toilets are "unsafe and unmerchantable. They have either already failed or are substantially certain to fail before the end of their useful lives." (CFACC ¶ 38.) In this regard the complaint points to Sloan's own recall notice of June 21, 2012, entitled "Flushmate Recalls Flushmate® III Pressure-Assisted Flushing System Due to Impact and Laceration Hazards." (CFACC ¶¶ 44–47 & Ex. E thereto.)

Plaintiffs assert seventeen claims on behalf of proposed nationwide and state Classes, including fraudulent concealment, violation of the Unfair Competition Law, and breach of warranty. (CFACC ¶¶ 141–305.) The CFACC prays for damages corresponding to the loss in value of the toilets due to the defect, or the cost of replacing the Flushmate Systems or the toilets in which they were

1  incorporated. (CFACC ¶ 128.)

2     **D.    Settlement Negotiations, Related Proceedings in This Court, and
3            Confirmatory Discovery.**

4        Four all-day mediations were held in spring 2013, on April 18 and 19, and

5  May 13 and 14, 2013. (Declaration of Kristen Law Sagafi in Support of Preliminary

6  Approval of Class Action Settlement ("Sagafi Decl."), ¶ 1.) The parties'

7  negotiations were hard-fought, contested, and at arms' length. (Sagafi Decl., ¶ 11.)

8  A retired Superior Court Judge, the Honorable William J. Cahill of JAMS,

9  supervised and facilitated the negotiations. (Sagafi Decl., ¶ 11.)

10       After much back-and-forth, and after the negotiations appeared on the verge

11  of breaking down, the parties (including the *Dimov* plaintiffs) came to an agreement

12  regarding the core settlement terms on May 17, 2013. (Sagafi Decl., ¶¶ 11-12.) The

13  parties promptly informed this Court, which on May 28, 2013 stayed this action for

14  60 days so the parties could work toward finalizing their agreement. (ECF Nos. 91–

15  92.)

16       Painstaking negotiations regarding specific terms followed. (Sagafi Decl., ¶

17  12.) The parties' initial exchange of drafts in June 2013 brought to light an

18  inconsistent view of whether the settlement covered claims for economic loss only

19  (Plaintiffs' view) or for property damage as well (Defendants' view). (Sagafi Decl.,

20  ¶ 13.) The parties' diverging views on this issue necessitated another full-day

21  mediation session before Judge Cahill on July 25, 2013. (Sagafi Decl., ¶ 13.) The

22  parties continued to talk after this fifth day of mediation, and were able to reach an

23  agreement in principle on July 29, 2013. (Sagafi Decl., ¶ 14.) Property damage

24  claims are included in the Settlement now before the Court, based upon

25  Defendants' agreement to pay them in full and to make available additional,

26  uncapped funds to pay them if certain thresholds detailed in the Settlement

27  Agreement are met. (Sagafi Decl., ¶ 14.)

28       On August 2, 2013, the Court extended the stay until September 30, 2013.

1    (ECF No. 106.) The parties then worked steadily toward a finalized settlement

2    agreement. (Sagafi Decl., ¶ 16.) On August 8, 2013, Sloan produced informal

3    discovery. On August 27, 2013, Plaintiffs' counsel prepared a revised draft

4    settlement agreement incorporating the agreement in principle reached on July 29,

5    2013. On September 9, 2013, Plaintiffs' counsel provided Defendants' counsel with

6    a separate detailed draft claims protocol. Defendants' counsel provided comments

7    to both drafts at an in-person meeting on September 18, 2013. (Sagafi Decl., ¶ 16.)

8          On September 30, 2013, the Court again extended the stay, until November

9    29, 2013. (ECF No. 110.) After further negotiation about the Settlement terms,

10   counsel for the settling parties met again in person on October 8, 2013. (Sagafi

11   Decl., ¶ 17.) Counsel also met in person with the Claims Administrator on October

12   25, 2013, in Lancaster, California to discuss claims processing logistics. (Sagafi

13   Decl., ¶ 18.)

14         For good cause shown, the Court then extended the stay until November 29,

15   2013, and finally until January 28, 2014. (ECF Nos. 110, 114.) On December 9 and

16   10, 2013, Plaintiffs took two noticed Rule 30(b)(6) "person most knowledgeable"

17   depositions of Sloan. (Sagafi Decl., ¶ 20.) The first deposition was to explore the

18   engineering design and soundness of the Repair Kit, as Plaintiffs had previously

19   questioned its efficacy. (Sagafi Decl., ¶ 20; TAC ¶¶ 47–55.) The second deposition

20   was to determine whether Sloan has sufficient financial resources to meet its

21   obligations under the Settlement. (Sagafi Decl., ¶ 20.) The testimony satisfied

22   Plaintiffs in both respects. (Sagafi Decl., ¶ 20.)

23         Counsel for the settling parties also negotiated various claims administration

24   details to ensure that the Settlement comports with Sloan's reporting obligations

25   under the terms of the voluntary CPSC recall. (Sagafi Decl., ¶ 22.) Following

26   months of extensive due diligence and coordination, the parties succeeded in

27   finalizing the details of their agreement, and signed it between January 18 and

28   January 22, 2014. (Sagafi Decl., ¶ 21.)

### III.   SUMMARY OF THE SETTLEMENT TERMS

The Settlement Agreement resolves all claims of Plaintiffs and the Settlement Class against the Defendants. The details of the Settlement are contained in the Agreement (attached to the Sagafi Declaration as Exhibit 1) and the Plan of Allocation (attached thereto as Exhibit 2). Below is a summary of these operative documents.

### A.   Settlement Class.

The Settlement provides cash reimbursement to members of the "Settlement Class," defined to include "any Person who owns or owned a Flushmate System or Flushmate Toilet installed in the United States."[4] Settlement, § I (Definition of "Class").

Under the Settlement, a Flushmate Toilet means any toilet equipped with a Flushmate System. The Flushmate System is defined as any Series 503 Flushmate III Pressure-Assist Flushing System manufactured by Flushmate between October 14, 1997 and June 30, 2009. The manufacturing date code/serial number is 16 characters long and is located on the label on the top of the Flushmate System's polypropylene vessel. The first six numerals of the serial number are the

---

[4] Excluded from the Class are (1) Defendants, any entity in which Defendants have a controlling interest, or which has a controlling interest in Defendants and Defendants' legal representatives, assigns, and successors, and any retailers or wholesalers of the Flushmate System or Flushmate Toilets, and (2) the judges to whom this case is or was assigned and any members of the judges' immediate families. Also excluded from the Class are (3) all Persons who have obtained a judgment against Defendants with regard to the Released Claims on or before the date of Preliminary Approval by the Court; (4) all Persons who, prior to Preliminary Approval, received cash reimbursement from Flushmate for property damage resulting from a Burst or Leak in their Flushmate System; (5) all Persons who have incurred damages as a result of a Leak or Burst of a Flushmate System that occurred on or before August 9, 2008, but who have not brought any civil action relating thereto on or before August 9, 2012; (6) all Persons whose Property previously contained, but no longer contains, a Flushmate System or Flushmate Toilet, and have not experienced a Leak or Burst of a Flushmate System or Flushmate Toilet, except Persons who replaced their Flushmate Toilets in response to the Recall; and (7) all Persons who formerly owned Property that contained a Flushmate System, and did not experience a Leak or Burst of a Flushmate System or Flushmate Toilet during their ownership.

manufacturing date code. The manufacturing date code range for the Recall begins with 101497 (October 14, 1997) and continues through 063009 (June 30, 2009). *See* Settlement, § 1 (Definitions of "Flushmate Toilet" and "Flushmate System").[5] The serial number is easily visible upon lifting the lid of the porcelain tank on any Flushmate Toilet, making it simple and easy for consumers to ascertain whether they are members of the Settlement Class.

## B.   Settlement Consideration.

Defendants agree to pay a minimum of $18 million in cash for the benefit of the Settlement Class. Specifically, Settlement Class members who have (1) installed a Repair Kit, (2) installed a replacement pressure vessel, (3) installed a replacement toilet, and/or (4) sustained direct Property Damage as a result of a Leak or Burst of a Flushmate System at any time prior to the close of the Claims Period will be eligible to submit a claim during the Claims Period. Here, each type of relief is addressed in turn.

### 1.   Reimbursement for Installation Costs.

Under the terms of the Recall, Flushmate will provide a free Repair Kit to any Flushmate Toilet owner. The Repair Kit, depicted in detail at Exhibit A to the Settlement Agreement, comprises a metal U-band that encircles the Flushmate System within the Flushmate Toilet and an external pressure regulator to be installed between the water supply line and the toilet fixture. While the U-Band itself does not strengthen the weld seam in the pressure vessel or prevent leaks, it does serve to contain the pressure vessel in the event of a weld seam separation, thereby reducing the likelihood of a burst forceful enough to shatter the porcelain fixture. The external regulator further reduces the likelihood and severity of a weld seam separation by reducing the pressure within the Flushmate System.

While the Repair Kit was designed for ease of installation, some Class

---

[5] Other capitalized terms used in this brief have the meaning ascribed to them in section I of the Settlement Agreement.

members report feeling unqualified or otherwise unable to install the Repair Kit
without professional assistance. Class members who choose to engage a plumbing
professional to install the Repair Kit may expect to pay between $100-200 for that
service. Under the Settlement, Class members who submit qualified claims for
reimbursement for Repair Kit installation will receive a pro rata distribution from
the Settlement Fund in accordance with proof and claims volume. *See* Plan of
Allocation, § I.B.1. Class Counsel anticipate that Claimants will receive
approximately $50.00 per Flushmate Toilet, with $25.00 for each additional
Flushmate Toilet located at the same property address. Cash reimbursement at this
level supplements the relief available to Class members beyond what is available
under the Recall.

Similarly, Class members who paid to replace a burst or leaking Flushmate
System or paid to replace their Flushmate Toilet altogether as a result of the Recall
will be entitled to a cash payment for their unreimbursed replacement expenses. For
these Class members, too, it is anticipated that eligible claimants will receive
approximately $50.00 per Flushmate Toilet, with $25.00 for each additional
Flushmate Toilet located at the same property address.

## 2. Full Reimbursement for Repairs Related to Property Damage.

While the failure rate has been quite low, some Class members have
nonetheless experienced leaking or burst Flushmate Systems that resulted in
shattered fixtures and/or property damage to the area surrounding the Flushmate
Toilet. For those Class members, the Settlement provides complete recovery of all
reasonable and documented unreimbursed expenses incurred to restore the affected
Property to its pre-damage condition. *See* Plan of Allocation, § I.B.2. In addition, if
any qualifying Property Damage claims remain unpaid after Defendants'
guaranteed payments totaling $18 million have been exhausted, and the total
amount of paid Property Damage claims exceed $1.5 million, Defendants will be

required to pay the unpaid qualified Property Damage claims in full. *See*
Settlement, § IV.A.4. Finally, Property Damage claims arising after the conclusion
of the Claims Period are not released in the Settlement; this Settlement does not
compromise in any way the rights of Flushmate System owners who experience
Property Damage after the Claims Period closes.

### C.   Settlement Funding Schedule.

The Settlement obligates Defendants to contribute a guaranteed total of $18
million to the Settlement Fund according to a negotiated three-year schedule.
Settlement, § IV.A. In the first year of funding, Defendants will transfer $2 million
into the Settlement Fund Trust Account within ten days after preliminary approval;
an additional tranche of $4.5 million will be transferred within ten days after the
Effective Date; and a final transfer of $2.5 million will be made within six months
after the Effective Date. *See* Settlement, § IV.A.1. Accordingly, the total Settlement
payments during Year One will be $9 million. In Year Two, Defendants will pay a
total of $6 million, in two installments, of $4 million and $2 million. *See*
Settlement, § IV.A.2. In Year Three, Defendants will pay another $3 million in four
equal installments. *See* Settlement, § IV.A.3. This guaranteed monetary
consideration equals $18 million.

Should any qualifying Property Damage claims remain unpaid after
Defendants' guaranteed payments have been exhausted, and should the total
amount of paid Property Damage claims exceed $1.5 million, then Defendants will
be responsible for paying the remaining reasonable Property Damage claims. *See*
Settlement, § IV.A.4. In this regard, the Settlement Agreement is effectively
"uncapped" with regard to Property Damage claims.

After all Eligible Claims for reimbursement have been paid, any funds
remaining in the Settlement Fund Trust Account may be distributed to the claimants
if feasible, or distributed *cy pres* subject to the Court's approval. *See* Settlement, §
V.C; Plan of Allocation, § I.B.3.

### D. **Claims Process.**

Section V of the Settlement, in conjunction with the more detailed Plan of Allocation, sets forth the claims process. Claimants whose property contains more than one Flushmate Toilets can file multiple claims, one for each toilet. *See* Settlement, § V.B. The costs associated with administering the Settlement will be paid out of the Settlement Fund Trust Account. *See* Settlement, §§ IV.B, V.E. For purposes of Settlement administration, claimants are sorted into two groups: economic loss claimants and property damage claimants.

- **Economic loss claimants.** Owners of Flushmate Toilets can submit claims for reimbursement associated with their installation of a Repair Kit, replacement pressure vessel, or replacement toilet. As discussed above, it is anticipated that these claimants will receive a minimum $50 cash payment upon proof of the installation. For properties with multiple Flushmate Toilets, claimants will receive additional compensation for each subsequent installation. *See* Plan of Allocation, I.B.1.

- **Property damage claimants.** Owners of Flushmate Toilets whose Property was damaged as a result of a leak or a burst toilet are entitled to reimbursement for the reasonable and necessary documented expense to restore the Property to its pre-damage condition. *See* Plan of Allocation, I.B.2.

Claimants whose Flushmate Toilets have already been repaired or replaced at Sloan's expense, or whose property damage claims relating to Flushmate Toilets have already been paid or resolved by Sloan, are not eligible for relief. *See* Plan of Allocation, fn. 2.

The parties propose that Class Litigation Administration and Support Services ("CLASS") implement the Plan of Allocation. One of CLASS's principals, Arnold Rodio, is a plumbing expert and experienced claims administrator who is the former president of the largest California plumbing trade group and a member

of various committees of the international plumbing trade group responsible for promulgating uniform plumbing standards. Mr. Rodio has administered property damage claims arising from numerous civil actions, and is well-qualified to administer the claims under this Settlement. (Declaration of Arnold Rodio in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement, and Exhibits A & B thereto.) Accordingly, the parties respectfully request that the Court approve CLASS's appointment as the Claims Administrator.

The Settlement provides for the appointment of a Special Master who will resolve certain disputes that may arise during Settlement administration. The parties have agreed that the respected mediator Michael J. Ney will serve as the Special Master and respectfully request that this Court approve his appointment. *See* Settlement, § I (Definition of "Special Master"); Plan of Allocation, §§ IV.D, VI. No appeal will lie from the Special Master's decisions, except that, if necessary, the parties may submit letter briefs to this Court regarding disputes over property damage claims. *See* Plan of Allocation, § VI. The Settlement also provides for the appointment of a Special Circumstances Committee, comprising the Claims Administrator and representatives of Plaintiffs and Defendants, to resolve large, disputed, or unusual claims in the first instance. *See* Plan of Allocation, § V.

During the Claims Period, Class Counsel will submit an annual report to the Court detailing the work performed by the Claims Administrator and the amounts paid to the Settlement Class during the prior year. *See* Settlement, § V.E. At the end of the Claims Period, the Settlement Class members will revert to their remaining warranty rights, which the Settlement preserves. *See* Settlement, § VI.D.

## E.    Proposed Class Notice.

During the course of the settlement negotiations, Plaintiffs' counsel worked at length with one of the country's premier notice providers, Kathy Kinsella, to develop a customized plan for distribution of settlement notice if and when preliminary approval is granted. (Sagafi Decl., ¶ 22.) Plaintiffs' counsel also

consulted with Arnold Rodio, who as noted has extensive expertise in administering class action settlements involving plumbing issues and property damage claims, to determine how best to disseminate effective notice to the Class. (Sagafi Decl., ¶ 22.) These discussions, and Plaintiffs' counsel's extensive class action experience, informed the proposed Notice Plan that accompanies the Settlement. (Declaration of Katherine Kinsella ("Kinsella Decl."), Ex. 3.)

Subject to entry of the Stipulated Protective Order being submitted concurrently with this Motion, Defendants will provide a list of known Settlement Class members and other known contacts within the Flushmate distribution chain to whom notice of the Settlement will be directly mailed. (Kinsella Decl., Ex. 3 (Notice Program) at 10.) *See also* Settlement, § III.A. Notice will be mailed not only to these 166,098 Class members who previously registered the location address of their Flushmate Systems, but also to more than 100,000 plumbing and general contractors. (Kinsella Decl., Ex. 3 (Notice Program) at 33.)

Further, the Settlement notice will be published in a cost-effective manner in more than 25 media outlets, including *People*, *Time*, *Parade*, *USA Weekend*, and *Better Homes & Gardens*, as well as on the Internet. (*Id*. at 21–24, 30–31, 34.) The notice will also appear in 10 publications likely to be read by commercial, public, and other owners of Flushmate Toilets. (*Id*. at 25–28.)

A Settlement-specific website will be launched, providing easy access to all Settlement documents, including the long-form and summary notices as well as other pertinent documents such as the Settlement Agreement, the Plan of Allocation, and Claim Forms. (*Id*. at 40.) Class members will be able to file Settlement claims directly on this website. (*Id*.) Finally, a toll-free number will be established so that Settlement Class members can obtain direct answers to questions. (*Id*. at 41.)

The forms of notice will be substantially similar to the draft Notices attached as Exhibits B, E, F, and H to the Notice Program, which is attached as Exhibit 3 to

the Kinsella Declaration. In addition to containing a photograph of the Flushmate System to enhance Class members' ability to determine whether they belong to the Class, the Notices provide clear information regarding the Settlement terms, the Fairness Hearing, Class members' rights to object to or opt out of the Settlement, and the request for attorneys' fees and costs. (*Id.*)

### F.   Attorneys' Fees and Costs; Incentive Awards.

Defendants agree not to oppose a request by Plaintiffs' counsel for attorneys' fees of 25 percent of the Settlement Fund Trust Account (to be paid in proportional installments when the sequenced deposits are made), plus reimbursement for reasonable litigation expenses incurred in furtherance of prosecuting this action and the related actions. *See* Settlement, § VII. Defendants also agree not to oppose a request by Plaintiffs' counsel for a $1,000 incentive award to each of the Class Representatives. *See* Settlement, § VIII. Plaintiffs' Counsel will submit their motion for an award of attorneys' fees, costs, and incentive awards for the Class representatives in advance of final approval as ordered by this Court.

### G.   Settlement Release.

In exchange for the valuable consideration summarized above and set forth in greater detail in the Settlement, Plaintiffs agree to an appropriately tailored release of Defendants from liability. *See* Settlement, § VI.A. This release will preclude future claims "to the extent such claims are alleged to be caused by, arise out of, or relate to any claim asserted, or that could have been asserted, in the Action relating to the Flushmate System and/or Flushmate Toilets." Settlement, § I (Definition of "Released Claims"). As noted above, the release does not prevent Settlement Class members from exercising their rights under any applicable written express warranties offered with Flushmate Systems and Flushmate Toilets during or after the Claims Period. *See* Settlement, § VI.D. Further, the release does not extinguish any wrongful death, personal injury, or emotional distress claims; or any claims for property damage that may arise after the end of the Claims Period. *See* Settlement,

§ I (Definition of "Released Claims").

## IV.  THIS SETTLEMENT SATISFIES THE LEGAL STANDARDS FOR OBTAINING PRELIMINARY APPROVAL

### A.  Summary of Argument.

Judicial proceedings under Federal Rule of Civil Procedure 23 follow a defined three-step procedure for approval of class action settlements:

(1)  Certification of a settlement class and preliminary approval of the proposed settlement after submission to the Court of a written motion for preliminary approval.

(2)  Dissemination of notice of the proposed settlement to the affected class members.

(3)  A formal fairness hearing, or final settlement approval hearing, at which class members may be heard regarding the settlement, and at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement are presented.

Federal Judicial Center, *Manual for Complex Litigation* § 21.63, *et seq*. (4th ed. 2004) ("*Manual*"). This procedure safeguards class members' due process rights and enables the Court to fulfill its role as the guardian of class interests. *See* 4 *Newberg on Class Actions*, § 11:22, *et seq*. (4th ed. 2002) ("*Newberg*"). With this motion, Plaintiffs ask the Court to take the first step in the approval process by granting preliminary approval to the Settlement agreed upon by the parties.

As discussed above, the Settlement follows months of contested negotiations, including several day-long negotiating sessions supervised by a retired judge. All counsel strongly support the final agreement, which is well within the range of reasonableness in light of the consideration offered to the Settlement Class and the risks of ongoing litigation, including the potential difficulty of obtaining certification of a multi-state consumer class. This Settlement provides substantial

cash relief—a minimum of $18 million—for the benefit of owners of Flushmate Toilets equipped with pressure vessels that are subject to leaks and bursts. The cash payments will fairly and substantially reimburse Settlement Class members for expenses connected with the repair or replacement of the affected toilets. Hence, the Settlement will supplement the free Repair Kit provided under the voluntary Consumer Product Safety Commission Recall. Moreover, the Settlement before the Court achieves a public safety benefit by providing Flushmate Toilet owners with an incentive to repair or replace toilets. Indeed, the Settlement achieves the key goals of this litigation—providing compensation to owners of Flushmate Toilets and promoting consumer safety. Preliminary approval of this valuable, carefully structured Settlement should be granted.

### B.   Preliminary Approval Is Appropriate.

"[V]oluntary conciliation and settlement are the preferred means of dispute resolution"—particularly in complex class actions. *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982) ; *Churchill Village, L.L.C. v. Gen. Elec.*, 361 F.3d 566, 576 (9th Cir. 2004); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) ("[S]trong judicial policy . . . favors settlements, particularly where complex class action litigation is concerned").

"[T]he decision to approve or reject a settlement is committed to the sound discretion of the trial judge because he is exposed to the litigants and their strategies, positions, and proof." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). In the exercise of its discretion, the Court should give "proper deference to the private consensual decision of the parties . . . . [T]he court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Id*. at 1027; *see* Fed. R.

1    Civ. P. 23(e).

2    At the preliminary approval stage, the Court need only find that the proposed

3    settlement is within the "range of reasonableness," such that dissemination of notice

4    to the class and the scheduling of a fairness hearing are worthwhile and appropriate.

5    4 *Newberg* § 11:25; *see also In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078,

6    1079-80 (N.D. Cal. 2007); *Young v. Polo Retail, LLC*, 2006 WL 3050861, at *5

7    (N.D. Cal. Oct. 25, 2006).

8    While consideration of the requirements for *final* approval is unnecessary at

9    this stage, all of the pertinent factors weigh in favor of approving the present

10   Settlement.[6] The Settlement readily meets the standard for preliminary approval

11   because: (a) it is the product of serious, arms' length negotiations between the

12   parties, reached after substantial and hard-fought litigation and thorough

13   investigation; (b) it provides substantial relief to the Settlement Class and is fair,

14   reasonable, and adequate given the alleged harm, the value provided to Settlement

15   Class members, and the litigation risks; and (c) it was negotiated and is

16   recommended by experienced Plaintiffs' counsel, and was reached with the help of

17   an experienced mediator.

18       **1.**   **The Settlement Is the Product of Arms' Length Negotiations**
19              **and Is Informed by the Litigation and by Factual**
              **Investigations.**

20   Where a settlement, as here, is the product of arms' length negotiations

21   conducted by capable and experienced counsel, the Court begins its analysis with a

22   presumption that the settlement is fair and reasonable. *See* 4 *Newberg* § 11:41; *In re*

23   *Heritage Bond Litig.*, 2005 U.S. Dist. LEXIS 13555, at *9 (C.D. Cal. June 10,

24   2005) ("A presumption of correctness is said to 'attach to a class settlement reached

25   in arm's-length negotiations between experienced capable counsel after meaningful

26   _____

27   [6] Plaintiffs will address in detail each of the factors required for final settlement
     approval in their Motion for Final Approval of the Settlement, to be submitted
28   following issuance of notice to the Settlement Class.

1  discovery.'") (quoting *Manual for Complex Litigation (Third)* § 30.42 (1995));

2  *Create-A-Card, Inc. v. Intuit, Inc*., 2009 U.S. Dist. LEXIS 93989, at *8-9 (N.D.

3  Cal. Sept. 22, 2009) (court "begins its analysis with a presumption that a class

4  settlement is fair and should be approved if it is the product of arm's-length

5  negotiations conducted by capable counsel with extensive experience in complex

6  class action litigation.").

7       The parties to this litigation engaged in four full days of mediation spanning

8  several weeks before well-respected mediator, Judge William J. Cahill. Those

9  negotiations, while at times contentious, ultimately resulted in an agreement in

10  principle on the key terms of the proposed Settlement. (Sagafi Decl., ¶ 11.) The

11  parties then worked to negotiate and finalize the Settlement terms for nine months.

12  (Sagafi Decl., ¶ 10.) The parties were represented by counsel experienced in the

13  prosecution, defense, and settlement of complex class actions, and were guided by

14  the Court's prior rulings in this case. It is beyond dispute that this Settlement "was

15  negotiated on an 'arms-length' basis between parties of equal bargaining power[.]"

16  Settlement, § XIV.D.

17       Furthermore, the Settlement is informed by Plaintiffs' thorough investigation

18  and comes after hard-fought litigation. Prior to filing their initial complaint, and

19  continuing throughout the litigation, Plaintiffs closely investigated the problems

20  with the Flushmate System, including by conducting interviews and independent

21  research into the Flushmate System and supply chain. (Sagafi Decl., ¶ 9.) In

22  addition to their own investigation, Plaintiffs' counsel retained plumbing,

23  engineering, and plumbing code experts to investigate the facts and assess the

24  viability and strength of the claims. (Sagafi Decl., ¶ 9.) Settlement negotiations

25  were also informed by the Recall and the discovery that Defendants provided in the

26  course of the negotiations. (Sagafi Decl., ¶ 10.) Similarly, this Court's order

27  resolving the motion to dismiss the FAC was invaluable in helping the parties

28  assess the strengths and weaknesses of their respective positions. (Sagafi Decl., ¶

1    10.)

2         Plaintiffs' counsel thus had a sound basis for weighing the benefits of this

3    Settlement against the risks attending continued litigation. Sufficient investigation

4    has been conducted to allow counsel and the Court to evaluate the Settlement terms.

5    Assuming the proposed Settlement is finally approved on the schedule proposed

6    herein, this litigation will be resolved within approximately two years of filing. To

7    the extent that the Settlement might be viewed as "early" because the class

8    certification issues have not yet been litigated, this is "an early resolution [that]

9    demonstrate[s] that the parties and their counsel are well prepared and well aware

10   of the strength and weaknesses of their positions and of the interests to be served by

11   an amicable end to the case." *In re AT&T Mobility Wireless Data Servs. Sales Tax*

12   *Litig*., MDL No. 2147, 2011 WL 2204584 (N.D. Ill. June 2, 2011) (citations

13   omitted). But for the skill and experience of counsel for all Parties, this Settlement

14   would not have been possible within this two-year period.

15           **2.     This Settlement Is Within the Range of Reasonableness**

16                    **Given the Benefits Conferred and the Risks of Litigation.**

17        The Settlement here provides fair and adequate benefits to the Settlement

18   Class when considered in light of the litigation risks. Every Settlement Class

19   member who installs the Repair Kit, a replacement pressure vessel, or a

20   replacement toilet, whose efficacy Plaintiffs investigated and confirmed through

21   discovery, is expected to receive a minimum payment of $50. Some Settlement

22   Class members may install the Repair Kit themselves free of charge; those who hire

23   a plumber to do so will pay an estimated range of $100 to $200. (Sagafi Decl., ¶

24   20.) The Settlement thus confers an adequate percentage of recovery upon the

25   Settlement Class members, even absent the likelihood of supplemental payments to

26   them if unclaimed funds remain after the Claims Period. *See* Settlement, § V.D. "A

27   settlement can be satisfying even if it amounts to a hundredth or even a thousandth

28   of a single percent of the potential recovery." *Behrens v. Wometco Enters., Inc*., 118

F.R.D. 534, 542 (S.D. Fla. 1988); *see also In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 581 & n.5 (E.D. Pa. 2003) (gathering cases where courts approved settlements achieving only single-digit percentages of potential recoveries).

The Settlement here not only provides tangible benefits to the Settlement Class; it also promotes safety by creating an incentive for owners of the recalled toilets to repair or replace them. For example, "hundreds of members of the public every week" use the toilets installed at lead Plaintiff UDC's property. (CFACC ¶ 86.) This broader safety benefit supplies a further reason for preliminary approval.

The Settlement is even more compelling given the substantial litigation risks. Nationwide class certification under California law or the laws of multiple states would have presented an uphill battle. *See Mazza v. American Honda Motor Co.*, 666 F.3d 581, 590-94 (9th Cir. 2012); *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 94 (D. Mass. 2008) (noting that "[w]hile numerous courts have talked-the-talk that grouping of multiple state laws is lawful and possible, very few courts have walked the grouping walk."). The potentially individualized issue of Class members' reliance upon Sloan's representations or omissions would have raised an additional hurdle to certification of any fraud claim. *See McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 222-26 (2d Cir. 2008).

This Court has already dismissed Plaintiffs' fraud-based claims under California law—without leave to amend as to the toilet manufacturer Defendants. (ECF No. 65 at 4–14.) Establishing Sloan's liability for fraud would have been challenging, because no Plaintiff relied directly on a representation or omission made by Sloan. There could be no guarantee that Plaintiffs' theory of indirect reliance through "Advisors" and the distribution chain would have been found legally viable. *See Mirkin v. Wasserman*, 858 P.2d 568 (Cal. 1993). Plaintiffs also would have needed to establish that Sloan knew or should have known of the defect but failed to disclose it until the Recall Notice.

Sloan would have mounted challenges to the express warranty claims as well.

It would have argued that its limited warranty covering "defects in materials and workmanship" does not extend to the alleged design defect. It would have further argued that the warranty claim lacks merit because Plaintiffs allegedly did not satisfy all the conditions precedent, i.e., contacting Sloan to request warranty service and making their toilets available for inspection. In addition, Sloan would have attacked the warranty claims on the grounds that the defect did not manifest and/or was not substantially certain to manifest in most of the Flushmate Toilets owned by Plaintiffs and the putative Class.

Even if Plaintiffs could have prevailed against experienced defense counsel to overcome these and other obstacles, and even if Plaintiffs could have obtained a class certification order, successfully defended it on appeal under Fed. R. Civ. P. 23(f), defeated summary judgment, and proceeded to trial, victory before the trier of fact would have been uncertain because of the express warranty and the relief already available under the Recall procedures. *Cf. Enterprise Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 248 (S.D. Ohio 1991) (rejecting the argument "that the Class should get more" because of the "very real potential that the Class could come away from a long expensive trial with nothing."). The uncertainty here was compounded by the appeals that likely would have followed any verdict.

While Plaintiffs believe they have a strong case, there can be no denying the formidable class-wide risks. Assessed against these risks, and the delays and uncertainties associated with protracted litigation of putative consumer class actions, the Settlement providing substantial cash benefits falls within the range of reasonableness.

### 3. Plaintiffs' Counsel, Highly Experienced Class Action Attorneys, Support the Settlement.

The judgment of competent counsel regarding the Settlement should be accorded significant weight. *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,

221 F.R.D. 523, 528 (C.D. Cal. 2004) (" 'Great weight' is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation."); *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979) ("The recommendations of plaintiffs' counsel should be given a presumption of reasonableness.").

Plaintiffs' counsel here have plentiful experience litigating and settling consumer class actions and other complex matters. (Sagafi Decl., ¶ 23.) They have intensively investigated and litigated the factual and legal issues raised in this action. (Sagafi Decl., ¶ 9.) The fact that qualified and well-informed counsel endorse the Settlement as fair, reasonable, and adequate weighs in favor of its approval.

## V.   THE SETTLEMENT CLASS SHOULD BE CERTIFIED AND CLASS COUNSEL APPOINTED

Provisional certification of a settlement class is a required component of preliminary approval. The Court need not consider the manageability of a potential trial involving multiple states' laws because the Settlement, if approved, would obviate the need for a trial. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *Hanlon*, 150 F.3d at 1021-23. The Court can and should certify the Settlement Class because the requirements of Fed. R. Civ. P. 23(a) and 23(b)(3) have been met.

First, the members of the Settlement Class are so numerous that joinder of all members is impractical. Over 1.5 million Flushmate Toilets are estimated to remain in service across the United States. (Sagafi Decl., ¶ 9.)

Second, this litigation involves common class-wide issues that, absent the Settlement, would drive the resolution of Plaintiffs' claims. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). Several issues are common to Plaintiffs and the Settlement Class, including whether the Flushmate System is

1   subject to premature failure in advance of its useful life and therefore is not suitable

2   for use as a long-term plumbing product; whether the Flushmate System creates an

3   unreasonable safety risk to owners and users; whether Sloan knew or should have

4   known that the Flushmate System was defective; whether Sloan engaged in unfair,

5   unlawful, or fraudulent practices in violation of the UCL and similar laws; whether

6   Sloan engaged in false advertising when it represented to consumers that its

7   Flushmate System was of a certain standard, quality, and grade when it was not;

8   whether Sloan had a duty to disclose that toilets containing the Flushmate System

9   had exploded and caused property damage; and whether Sloan's alleged false

10  representations and concealment of the defective nature of the Flushmate System

11  were purveyed with the intent to deceive Plaintiffs and the Settlement Class.

12  (CFACC ¶ 135.)

13      Third, the claims of the representative Plaintiffs are typical of the claims of

14  the Settlement Class: all own Flushmate Toilets. Therefore, the facts surrounding

15  Defendants' alleged misconduct are common to Plaintiffs and the Settlement Class

16  members, all of whom were injured at the point of purchase, and all of whom own

17  toilets that carry a risk of bursting or leaking (or have already burst or leaked).

18      Fourth, the named Plaintiffs in this action and in the related actions are

19  adequate Class representatives whose interests in this litigation are coterminous

20  with the interests of the Settlement Class. They should therefore be appointed Class

21  representatives for purposes of this Settlement. There is no conflict among owners

22  of the toilets. Rather, the Plaintiffs and the Settlement Class members share the

23  same interest in maximizing their recovery and obtaining relief with dispatch.

24      Fifth, common issues predominate; and the proposed nationwide Settlement

25  is a superior way to resolve this nationwide controversy. As noted, because the

26  proposal here is to avoid a trial, the manageability factor codified at Rule

27  23(b)(3)(D) plays no role in the predominance analysis. *Amchem*, 521 U.S. at 620.

28  That mainly leaves the claims of fraudulent representations and omissions, and

other breaches, which focus on Defendants' conduct. For example, Sloan either had an obligation to disclose its knowledge of the problems with the Flushmate System or it did not. Sloan did not owe this obligation to some Settlement Class members but not to others. Similarly, it is implausible that the effect of Sloan's alleged misstatements and omissions differed between purchasers. *See, e.g.*, Advisory Committee Notes to Rule 23(b)(3) (1966 Amendments) (noting that "fraud perpetrated on numerous persons by the use of similar misrepresentations" can be "an appealing situation for a class action").

Moreover, the base measure of damages or restitution for the economic loss claims is the same whether the claim is for common law fraud, statutory fraud, or breach of warranty—and consists of the difference between the value Sloan promised and the value received by Plaintiffs and the Settlement Class. *See, e.g.*, *In re Vioxx Class Cases*, 180 Cal.App.4th 116, 131 (Cal. Ct. App. 2009) (in case premised on the UCL and False Advertising Law, "[t]he difference between what the plaintiff paid and the value of what the plaintiff received is a proper measure of restitution") (citing *Cortez v. Purolator Air Filtration Prods. Co.*, 999 P.2d 706, 713 (Cal. 2000) (same for common law fraud)); Cal. Comm. Code § 2714 ("The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted . . . ."). Apart from potential manageability issues that are irrelevant in the settlement context, the economic loss claims settled here raise no uncommon issues.[7]

---

[7] Courts have often found that class actions seeking to recover the difference between the value of a product (a) as represented and (b) as delivered present a common question amenable to class-wide resolution. For instance, in *Montanez v. Gerber Childrenswear, LLC*, 2011 U.S. Dist. LEXIS 150942, 2011 WL 6757875 (C.D. Cal. 2011)—which involved a litigation rather than a settlement class—the defendant contended that the class possessed no common damage claims because some of the children's garments it sold had not actually (or at least not yet) harmed the children. The court held that all class members suffered a common injury because they purchased a product less valuable than the defendant represented it to

*(Footnote continues on next page.)*

1    Nor are the predominating common issues overwhelmed by individualized

2    issues on account of the Settlement's limited release of property damage claims

3    arising from the same facts, which are subject to additional, uncapped

4    consideration. *See* Settlement, § IV.A.4. Notably, Defendants refused to settle

5    absent a release of these claims, and the important interest in putting major

6    controversies to rest on fair and adequate grounds favors certifying a Class that

7    includes the property damage claimants. *See Sullivan v. DB Invs., Inc.*, 667 F.3d

8    273, 310-12 (3d Cir. 2011) (en banc) (holding that the interest in "global peace"

9    favors certification of settlement classes whose claims arise from common

10   conduct). These property damage claims not only arise from the same factual

11   predicate as all the other claims, but they will be reasonably compensated separate

12   and apart from the economic loss claims. Further, any individual variations in

13   property damage claims (and any related disputes) can and will be dealt with in the

14   claims administration process and by the Special Master. Finally, the Settlement

15   preserves any and all property damage claims arising after the end of the Claims

16   Period. *See* Settlement, § 1 (Definition of "Released Claims"). As such, there are

17   "structural assurances" of fairness for this group and for all the other claimants.

18   *Amchem*, 521 U.S. at 627.

19        Pursuant to Rule 23(g), Plaintiffs' counsel also respectfully request that the

20   Court appoint as Class Counsel the firms whose attorneys negotiated this

21   Settlement.[8] The attorneys at these firms are capable class action attorneys with a

22   special focus on consumer protection and product defects; their diligence in

23   _____

24   be: "A child's garment that is disclosed to have potentially problematic levels of
     skin irritants is surely worth less, a priori, than a garment without skin irritants.

25   Indeed, a jury would likely find that no reasonable parents would purchase a
     garment that posed any credible risk to their child's health or safety." *Id*. at *2.

26   [8] Proposed Class Counsel are Birka-White Law Offices; Lieff Cabraser Heimann &
     Bernstein, LLP; Parker Waichman LLP; Levin Fishbein, Sedran & Berman, LLP;

27   Audet & Partners, LLP; Wexler Wallace, LLP.; Holland Groves Schneller & Stolze
     LLC; and Geragos & Geragos, P.C. *See* Settlement, § 1 (defining "Class Counsel").

28

1  securing this Settlement speaks for itself, and their appointment will facilitate a fair

2  and efficient administration of the Settlement should it be approved. Resumes of

3  the firms proposed to be appointed Class Counsel are attached as Exhibits 4

4  through 11 to the Sagafi Declaration.

5  ## VI.  THE PROPOSED CLASS NOTICE SHOULD BE APPROVED

6       Under Rule 23(e)(1), "[t]he court must direct notice in a reasonable manner

7  to all class members who would be bound by a proposed settlement, voluntary

8  dismissal, or compromise." Notice of a proposed settlement must inform class

9  members (1) of the nature of the pending litigation, (2) of the general terms of the

10  proposed settlement, (3) that more complete information is available on the docket,

11  and (4) that any class member may appear and be heard at the fairness hearing. *See*

12  *Newberg* § 8:32. The notice also must indicate that the court will exclude from the

13  class any member who requests exclusion, that the judgment will bind all class

14  members who do not opt out, and that any member who does not opt out may

15  appear through counsel. *See* Fed. R. Civ. P. 23(c)(2)(B).

16       The form of notice is "adequate if it may be understood by the average class

17  member." *Newberg* § 11:53. The notice must be "the best . . . practicable under the

18  circumstances, including individual notice to all members who can be identified

19  through reasonable effort." *Amchem*, 521 U.S. at 617. Publication notice is an

20  acceptable method of providing notice where the identity of specific class members

21  is not reasonably available. *See Tableware*, 484 F. Supp. 2d at 1080 (citing *Manual*

22  § 21.311).

23       Consistent with these requirements, nationally recognized notice expert

24  Katherine Kinsella of Kinsella Media, LLC has developed a proposed Notice Plan

25  that is both comprehensive and cost-effective. It includes:

26       1.  Direct notice by mail to each Settlement Class member identified by

27  reasonable effort;

28

1157345.3

- 28 -

2.  A summary notice published in numerous national and trade publications as well as on the Internet;

3.  The posting of both forms of notice in English and Spanish on a public website maintained by the Claims Administrator (www.flushmateclaims.com); and

4.  The establishment of a toll-free hotline for fielding Settlement Class member inquiries.

(Kinsella Decl., ¶ 9.) *See also* Settlement, § III.A.

The contents of the proposed Class Notice, which consists of a summary notice and a long form notice, fully comply with due process and Rule 23.[9] The Notice provides the definition of the Settlement Class, describes the nature of the Settlement and its terms (including the Plan of Allocation), explains the procedure for making comments and objections, and provides contact information so that any Settlement Class member may receive answers to questions regarding the Settlement. The Notice also provides the date, time, and place of the final approval hearing, and informs Settlement Class members that they may enter an appearance through counsel. The Notice further informs Settlement Class members how to exercise their rights, including how to comment on or object to the Settlement, and that the judgment will be binding upon them if they do not opt out. Last, the Class Notice informs the Settlement Class about the request for attorneys' fees and costs and incentive awards. Nothing further is required.

A postcard containing the short-form Notice will be mailed to 166,098 Class members who previously registered the address locations of their Flushmate Toilets. (Kinsella Decl., Ex. 3 (Notice Program) at 10.) The mailing of these postcards will be coordinated with the mailing of the notice of the expanded Recall;

---

[9] The proposed summary and long-form notices are attached as Exhibits B, E, F, and H to the Notice Program attached as Exhibit 3 to the Declaration of Katherine Kinsella. These notices are notable for their prominent photograph depicting how the Flushmate System looks in the toilet tank, which should make it relatively easy for Class members to determine whether they own one of the affected products.

the two mailings will be staggered so that class members will first receive the recall notice and then the postcard Settlement Notice. (*Id.*) Notice will also be mailed to over 100,000 plumbing and general contractors, many of whom are likely to provide word of the Settlement to their customers who own Flushmate Toilets. (*Id.* at 33.)

The publication component of the Notice Program has been designed to reach a high percentage of the Class in a cost-effective manner. The short-form Notice will appear in publications ranging from national newspaper supplements (*Parade*, *USA Weekend*), to national magazines (*People*, *Time*, *Better Homes & Gardens*, *National Geographic*, and *ESPN*), to a host of trade publications likely to be read by commercial, public, and other owners of Flushmate Toilets, to publications in United States Territories. (*Id.* at 11, 21–29.) The Notice will also appear as a banner ad on the Internet. (*Id*. at 30–31.)

All told, between the mailed Notice and the published Notice, notice of the proposed Settlement will reach an estimated 80% of consumer Class members and 76.5% of Class members who own Flushmate Toilets installed in commercial, public, and other properties. (*Id*. at 32.)

Class members will have the convenience of submitting claims directly on the Settlement website (www.flushmateclaims.com), where they will also be able to review pertinent Settlement documents. (*Id*. at 40.) Class members who have questions can call the toll-free Settlement hotline, which will be staffed with live operators with plumbing knowledge. (*Id*. at 41.)

## VII.  PLAINTIFFS' COUNSEL WILL APPLY SEPARATELY FOR ATTORNEYS' FEES AND COSTS AND INCENTIVE AWARDS

Plaintiffs' counsel intend to apply for an award of attorneys' fees of 25 percent of the Settlement fund, and for reimbursement of reasonable litigation costs; Defendants agree not to oppose this request. *See* Settlement, § VII; *Vizcaino v. Microsoft Corp*., 290 F.3d 1043, 1047-48 (9th Cir. 2002) (affirming

1  "benchmark" of awarding attorneys' fees in the amount of 25 percent of a common

2  fund). The attorneys' fee provisions in the Settlement contemplate deducting

3  attorneys' fees from the Settlement fund on a rolling basis as Defendants make their

4  payments, which will protect the Settlement Class by preventing the fund from

5  being depleted by fees at any given point. *See* Settlement, § VII.

6       Plaintiffs' counsel also intend to apply for a $1,000 incentive award payment

7  to each of the Class representatives in recognition of their service benefiting the

8  Settlement Class and the risks they took in prosecuting the underlying actions. *See*

9  Settlement, § VIII; *Rodriguez v. West Publ'g Corp*., 563 F.3d 948, 958-59 (9th Cir.

10 2009) (noting that service or incentive "[a]wards are generally sought after a

11 settlement or verdict has been achieved," and "are intended to compensate class

12 representatives for work done on behalf of the class . . . .").

13 **VIII.  THE FINAL APPROVAL HEARING SHOULD BE SCHEDULED**

14      The last step in the approval process is a Fairness Hearing at which this Court

15 may hear all evidence and argument necessary to determine whether to grant final

16 approval to the Settlement. Plaintiffs respectfully request that the Court set the

17 following schedule for further Settlement-related proceedings:

| | |
|---|---|
| Deadline for completion of Notice program | June 30, 2014 |
| Deadline for Class Counsel to file their motion for final Settlement approval and fee application | June 30, 2014 |
| Postmark deadline for Class members to request exclusion from Settlement | July 25, 2014 |
| Deadline for Class members to submit objections to the proposed Settlement and/or to Class Counsel's fee application | July 30, 2014 |
| Deadline for Plaintiffs and Defendants to file replies in support of final Settlement approval and/or Class Counsel's fee application, including responses to any objections | August 8, 2014 |
| Final Fairness Hearing | August 25, 2014 |

## IX.    **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully submit that the Court should: (1) grant preliminary approval to the Settlement; (2) certify the Settlement Class; (3) appoint as Class Counsel the Birka-White Law Offices, Lieff Cabraser Heimann & Bernstein, LLP, Parker Waichman LLP, Levin Fishbein, Sedran & Berman, LLP, Audet & Partners, LLP, Wexler Wallace, LLP, Holland Groves Schneller & Stolze LLC, and Geragos & Geragos, P.C; (4) appoint as Settlement Class Representatives United Desert Charities, Fred Ede, III, Emily Williams, Bruce Pritchard, Jean Steiner, Daniel Berube, Jeffrey Brettler, Randy Kubat, John Snyder, Milen Dimov, Trigona Dimova, Scott Iver, Neal Olderman, and Pankaj Patel; (5) appoint Kinsella Media, LLC as the Notice Provider and approve the proposed Notice Program and order notice to be disseminated; and (6) appoint Class Litigation Administration and Support Services as the Claims Administrator; (7) appoint Michael J. Ney as the Special Master; and (8) schedule a hearing for considering final approval of the Settlement and the motion for attorneys' fees and costs and incentive awards.

Dated: January 31, 2014

Respectfully submitted,

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

By: /s/ *Kristen Law Sagafi*
     Kristen Law Sagafi

Robert J. Nelson (State Bar No. 132797)
*rnelson@lchb.com*
Kristen Law Sagafi (State Bar No. 222249)
*klaw@lchb.com*
Jordan Elias (State Bar No. 228731)
*jelias@lchb.com*
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

1157345.3

1    David M. Birka-White (State Bar No. 85721)
     *dbw@birka-white.com*
2    Stephen Oroza (State Bar No. 84681)
     *soroza@birka-white.com*
3    Mindy M. Wong (State Bar No. 267820)
     *mwong@birka-white.com*
4    BIRKA-WHITE LAW OFFICES
     411 Hartz Avenue, Suite 200
5    Danville, CA 94526
     Telephone: (925) 362-9999
6    Facsimile: (925) 362-9970

7    Attorneys for Plaintiffs United Desert Charities,
     Fred Ede III, Emily Williams, Bruce Pritchard,
8    and Jean Steiner

9

10   Jordan Lucas Chaikin
     jchaikin@yourlawyer.com
11   PARKER WAICHMAN LLP
     3301 Bonita Beach Road Suite 101
12   Bonita Springs, FL 34134
     Telephone: (239) 390-1000
13   Facsimile: (239) 390-0055

14   Attorneys for Plaintiffs
     Daniel Berube and Jeffrey Brettler
15

16   Charles E. Schaffer
     cschaffer@lfsblaw.com
17   Brian F. Fox
     bfox@lfsblaw.com
18   LEVIN FISHBEIN SEDRAN & BERMAN
     510 Walnut Street, Suite 500
19   Philadelphia, PA 19106
     Telephone: (215) 592-1500
20   Facsimile: (215) 592-4663

21   Eric D. Holland
     eholland@allfela.com
22   HOLLAND GROVES SCHNELLER &
     STOLZE LLC
23   300 North Tucker Boulevard, Suite 801
     St. Louis, MO 63101
24   Telephone: (314) 241-8111
     Facsimile: (314) 241-5554
25

26   Attorneys for Plaintiffs
     Randy Kubat and John Snyder
27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mark John Geragos
geragos@geragos.com
GERAGOS AND GERAGOS PC
644 South Figueroa Street
Los Angeles, CA 90017-3480
Telephone: (213) 625-3900
Facsimile: (213) 625-1600

Attorneys for Plaintiffs Pankaj Patel, Daniel
Berube and Jeffrey Brettler

- 34 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>CERTIFICATION</u>

Pursuant to Civil Local Rule 5–4.3.4(a)(2)(i), Kristen Law Sagafi, the ECF User whose identification and password are being used to file the foregoing PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF attests that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Dated:  January 31, 2014          */s/ Kristen Law Sagafi*
                                            Kristen Law Sagafi